# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, FOR THE USE AND BENEFIT OF: HELIX ELECTRIC, INC., a California corporation,<br><br>Plaintiff,<br>v.<br>KISAQ RQ 8A 2JV, a joint venture; FEDERAL INSURANCE COMPANY, a New Jersey corporation; and WESTERN SURETY COMPANY, a South Dakota corporation,<br><br>Defendants | CASE NO. 15cv1024-WQH-KSC<br><br>ORDER |
| KISAQ RQ 8A 2JV, a joint venture,<br><br>Counter Claimant,<br>v.<br>UNITED STATES OF AMERICA FOR THE USE AND BENEFIT OF: HELIX ELECTRIC, INC., a California corporation; TRAVELERS CASUALTY & SURETY COMPANY OF AMERICA; and ROES 1 through 10, inclusive,<br><br>Counter Defendants. | |

HAYES, Judge:

The matter before the Court is the motion for summary judgment and partial summary judgment filed by Defendant and Counter Claimant KISAQ RQ 2JV ("the JV"), Defendant Federal Insurance Company ("Federal Insurance"), and Defendant

Western Surety Company ("Western Surety"). (ECF No. 25).

**I. Background**

On May 7, 2015, the United States of America for the Use and Benefit of Helix Electric, Inc. ("Helix") initiated this action by filing a complaint with a jury demand against the JV, Federal Insurance, and Western Surety. (ECF No. 1). The complaint alleges the following claims for relief: (1) breach of subcontract against the JV, (2) recovery under the Miller Act Payment Bond against Federal Insurance and Western Surety, and (3) quantum meruit against the JV. *Id.* At the hearing on this motion for summary judgment, the Court dismissed the complaint with prejudice.

On August 10, 2015, the JV, Federal Insurance, and Western Surety collectively filed an answer to the complaint. (ECF No. 8 at 1-8). The JV brings a counterclaim with a jury demand against Helix and Travelers Casualty & Surety Company of America ("Travelers"), and doe counter defendants. (ECF No. 8 at 9-18). The JV alleges breach of subcontract against Helix and recovery under performance and payment bond against Travelers. *Id.* On September 9, 2015, Helix and Travelers filed an answer to the counterclaim. (ECF No. 13).

On October 31, 2016, Federal Insurance, the JV, and Western Surety filed a motion for partial summary judgment and summary judgment. (ECF No. 25). The JV, Federal Insurance and Western Surety move for summary judgment as to the three causes of action alleged by Helix in the complaint and the JV moves for partial summary judgment as to liability on the JV's counterclaim for breach of subcontract arising from the Helix's alleged (1) failure to adequately staff the project, (2) abandonment of the project, and (3) defective work.[1] *Id.* On November 21, 2016, Helix filed a response in opposition to the motion for partial summary judgment and a

---

[1] The JV requests judicial notice of the Complaint (ECF No. 1), the Answer and Counterclaim filed by the JV, Federal Insurance, and Western Surety (ECF No. 8), and Helix's Answer to the Counterclaim (ECF No. 13) pursuant to Federal Rule of Evidence 201. The Court denies this request for judicial notice. *See, e.g., Asvesta v. Petroutsas*, 580 F.3d 1000, 1010 n.12 (9th Cir. 2009) (denying request for judicial notice where judicial notice would be "unnecessary").

1 response to the motion for summary judgment as to Helix's complaint. (ECF No. 28). On November 28, 2016, the JV, Federal Insurance, and Western Surety filed a reply.[2] (ECF No. 29).

On February 24, 2017, the Court heard oral argument on the motion for summary judgment and partial summary judgment.

## II. Statement of Fact

"On or about June 2, 2011, the JV entered into a written contract with the United States of America . . . for a work of improvement known as P136 Bachelor Enlisted Quarters, MCAS Cherry Point, NC ('Project'), Contract No. N40085-11-C-4026 ('Prime Contract')." (SUMF, ECF No. 29-1 at ¶ 1). "The Project involved the new construction of a Bachelor Enlisted Quarters building ('BEQ'), and the replacement of medium voltage 'offsite' work at electrical substations, duct banks, and manholes, at the Marine Corps Air Station in Cherry Point, North Carolina." *Id.* at ¶ 2. "On or about November 3, 2011, the JV entered into a written subcontract with Helix to complete all of the low voltage, communications, fire alarm systems, exterior lighting, and related electrical work for the BEQ, as well as the 'offsite' medium voltage replacement work." *Id.* at ¶ 3. "The original Subcontract amount was $6,150,000, which was subsequently increased by $85,466.54 in authorized change orders, resulting in a revised contract value of $6,235,466.54." *Id.* at *¶* 4.

The General Conditions of the Subcontract contains in part the following provisions:

> [13] B. Disputes Relating to CONTRACTOR
> (i) Duty to Proceed:
> SUBCONTRACTOR shall proceed diligently with performance of the Work pending final resolution of any request for relief, claim, appeal, or action arising out of disputes relating to CONTRACTOR.
> ...

---

[2] With its reply, the JV filed evidentiary objections to the declaration of Michael Mason (ECF No. 28-2) and the declaration of Derek Hancock (ECF No. 28-3), including attached Exhibits 4, 9, and 12 (ECF No. 28-4). (ECF No. 29-2). The JV objects to the exhibits on the grounds that the declarant lacks personal knowledge and the evidence is not self-authenticating or relevant. (ECF No. 29-2). The JV's objections are overruled at this stage of proceedings.

> 14. GUARANTEE
> SUBCONTRACTOR guarantees and warrants its work against all deficiencies and defects in materials and/or workmanship. SUBCONTRACTOR agrees to replace or repair, at CONTRACTOR's discretion, at SUBCONTRACTOR's sole cost and expense, and to the satisfaction of OWNER and CONTRACTOR, any and all materials or work adjudged by OWNER or CONTRACTOR to be defective or improperly installed. This guarantee shall continue for one (1) year following final acceptance and payment under the Subcontract, or for any lengthier period required by the Contract Documents.
> ...
> 22. PERFORMANCE and PROGRESS of the WORK
> A. Time is of the essence in this Subcontract . . . . The Work shall be carried on promptly, with dispatch, coordinated with other work on the Project, all to the satisfaction of CONTRACTOR and OWNER. If necessary, upon instruction from CONTRACTOR, certain parts of the Work shall be prosecuted by preference to others.
> ...
> 25. RECOURSE BY CONTRACTOR
> A. <u>Failure of Performance</u>
> (i) <u>Notice to Cure:</u> If SUBCONTRACTOR refuses or fails to supply enough properly skilled workers or proper materials, or maintain the work schedule . . . or otherwise is guilty of a material breach of this Agreement, SUBCONTRACTOR shall be deemed in default of this Subcontract. If SUBCONTRACTOR fails within forty-eight (48) hours after receipt of written notice to commence and continue satisfactory correction of such default with diligence and promptness, then CONTRACTOR, without prejudice to any other rights or remedies, shall have the right to any or all of the following remedies:
> (a) supply such number of workers and quantity of materials, equipment, or other facilities as CONTRACTOR deems necessary for the completion of SUBCONTRACTOR's work, or any part thereof which SUBCONTRACTOR has failed to complete or perform after said notice; and charge the cost thereof to SUBCONTRACTOR, who shall be liable for payment of same including reasonable overhead, profit, and attorney's fees.
> (b) contract with one or more additional contractors to perform such part of SUBCONTRACTOR's Work as CONTRACTOR shall determine will provide the most expeditious completion of the total work, and charge the cost thereof to SUBCONTRACTOR, withhold payment of any monies due SUBCONTRACTOR pending corrective action in amount sufficient to cover losses, and compel performance to the extent required by and to the satisfaction of CONTRACTOR and OWNER.

*Id.* at ¶¶ 5-9.

Following an electrical outage which occurred on July 31, 2014, the Government issued a Partial Suspension Order on the Project. *Id.* at ¶¶ 9,12. "The Partial Suspension Order prohibited the JV and Helix from resuming any electrical work on the Project until an acceptable 'Plan of Action' addressing safety and quality control procedures

for electrical work on the Project was approved by the Government." *Id.* at ¶ 14. "The Government lifted the suspension order on August 28, 2014." *Id.* at ¶ 26.

"On September 5, 2014, shortly after resuming electrical work on the Project, the JV notified Helix that as a result of the month-long suspension of all electrical work, Helix had been 'elevated to the top of the most critical activity list.'" *Id.* at ¶ 29. "Helix was advised by the JV to increase working hours and/or its work force to a level that could meet the JV's completion schedule." *Id.* at ¶ 30. "Despite the JV's September 5, 2014 request to Helix to increase working hours and/or its force, Helix did neither." *Id.* at ¶ 31.

On October 3, 2014, the JV sent a Notice to Cure letter to Helix stating,

> [The JV] has a concern about [Helix] is [sic] inadequately staffed and therefore unable to meet the required schedule of work under the referenced Prime Contract.
> Time is of the essence, so in accordance with Paragraph 25 (A) "Recourse by Contractor" of the reference Subcontract, this letter serves as your notice to cure within 48 hours after receipt of this letter and you must continue to satisfactorily perform thereafter.

(Exhibit 12, ECF No. 25-5 at 66).

"Helix responded to the Notice to Cure by disputing the claim of inadequate manpower, and again, refusing to supplement its work force." (SUMF, ECF No. 29-1 at ¶ 34). "Helix refused to supplement its work force because it believed that it had adequate staff to complete the work as scheduled, and that it was not obligated to complete out-of-sequence work." *Id.* at ¶ 35.

A copy of a letter to the JV from Derek Hancock, Project Manager at Helix, in response to the Notice to Cure letter states,

> In regard to [the JV's] claim of inadequate manpower by [Helix], this assertion is absolutely false. If the JV is in possession of concrete information that would indicate otherwise, rather than random, unfounded assertions in a Notice to Cure, then please forward this information and [Helix] will respond accordingly. As I'm sure you are aware, even the most recent updated CPM Field Schedule . . . is now completely inaccurate because of the continued delays in preceding activities that are having a direct impact on [Helix's] ability to perform our work in a timely and productive manner. In an effort to help manage the schedule activities, Helix Electric has provided two site observations reports, dated 7/8/14 and 7/22/14, which indicated conditions on the project that were impeding [Helix's] ability to perform the remaining work. To date we

> have received no response to these reports. ... Our current manpower, based on real time observations of the project is at the proper level to support the available work.

(Exhibit 4, ECF No. 28-4 at 16; Exhibit 12, ECF No. 25-6 at 2).

A subsequent letter to the JV from Brian Jordan, the Executive Vice President of Helix, on January 19, 2015 states that Helix "has always provided sufficient manpower to perform under the terms of our subcontract." (Exhibit 9, ECF No. 28-4 at 26). In the deposition of Brian Jordan, Jordan states that Helix rejected the request to add manpower, "Because we had enough – we had a core group of people there run by the superintendent, Herb who we felt was the most efficient way that we could pursue that job in light of how Kisaq-RQ was mismanaging it." (Exhibit 12, ECF No. 28-4 at 42-43).

"Beginning on November 11, 2014, and continuing through January 15, 2015, the JV utilized electricians and laborers provided by the Lyter Group ('Lyter') to supplement Helix's work force, and perform work falling within Helix's scope of work under the Subcontract." (ECF No. 29-1 at ¶ 39). "While Helix disagreed with the supplementation, the electrical work on the Project progressed from November 11, 2014 through January 15, 2015, with no criticisms from Helix regarding the quality of electrical work provided by Lyter." *Id.* at ¶ 40. "On January 12, 2015, Helix told the JV that it would no longer work or coordinate with the supplemental personnel, and if the supplemental personnel remained on the Project past January 13, 2015, Helix would cease all work on the Project and remove all company tools, equipment and personnel from the Project site." *Id.* at ¶ 41. "The JV kept Lyter's supplemental personnel on site past Helix's January 13, 2015 'deadline.'" *Id.* at ¶ 42. "On January 14, 2015, Helix informed the JV that it was demobilizing from the Project, and ceasing its work." *Id.* at ¶ 43.

"On January 14, 2015, the JV issued a Notice to Cure to Helix under paragraph 25(A) of the Subcontract advising Helix that the JV considered Helix in default of the Subcontract as a result of its abandonment of the Project." *Id.* at ¶ 45. "Following

Helix's demobilization from the Project, the JV utilized a combination of Blackwater . . . and Lyter Group . . . to complete Helix's remaining scope of work under the Subcontract." *Id.* at ¶ 48.

"Following completion of the Project, and after Helix had left without completing its Subcontract, it was discovered that certain medium voltage off-site work performed by Helix was defective." *Id.* at ¶ 35. "In particular the crimping of every one of almost 900 load break elbows was done with an incorrect crimping tool, resulting in loose joints, air gaps, and/or bent fittings." *Id.* at ¶ 49. "Helix admits that it used the wrong crimping tool and is responsible for the defective elbow/crimping conditions on the Project." *Id.* at ¶ 52. "In addition to the elbow crimping issues, additional electrical repair work was demanded by the Government as a result of various deficiencies in Helix's work." *Id.* at ¶ 53. "The deficiencies primarily stem from Helix's use of an incorrect universal splicing tool, and the lack of slack in the existing cables to replace splices." *Id.* at ¶ 54. The parties agree that Helix has admitted it was at fault for the end line splices and elbow crimping issues. *Id.* at ¶¶ 52, 55.

**III. Legal Standard on Summary Judgment**

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The materiality of a fact is determined by the substantive law governing the claim or defense. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).

The moving party has the initial burden of demonstrating that summary judgment

is proper. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970). The burden then shifts to the opposing party to provide admissible evidence beyond the pleadings to show that summary judgment is not appropriate. *See Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 322, 324. The opposing party's evidence is to be believed, and all justifiable inferences are to be drawn in its favor. *See Anderson*, 477 U.S. at 255. To avoid summary judgment, the opposing party cannot rest solely on conclusory allegations of fact or law. *See Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986). Instead, the nonmovant must designate which specific facts show that there is a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

## IV. The JV's Breach of Subcontract Counterclaim Against Helix

The JV contends it is entitled to partial summary judgment as to liability on its breach of subcontract counterclaim against Helix arising from Helix's alleged (1) failure to adequately staff the project, (2) abandonment of the project, and (3) defective work on the project.[3] (ECF No. 25-1 at 15-18). The JV seeks partial summary judgment only as to liability. (ECF No. 29 at 8). Helix contends that the JV is not entitled to partial summary judgment as to liability on its breach of subcontract claim in relation to any of the three specific instances of breach alleged by the JV. (ECF No. 28)

A breach of contract cause of action includes the following elements: "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." *Bushell v. JPMorgan Chase Bank, N.A.*, 163 Cal. Rptr. 3d 539, 544 (Cal. Ct. App. 2013) (citing *Reichert v. General Ins. Co.*, 443 P.2d 377, 381 (Cal. 1968)). "The basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting. . . . When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible. . . . 'The words of a contract are to be understood in their ordinary and popular

---

[3] The JV alleged a second claim for, "Recovery Under Performance and Payment Bond Against" against Travelers, that is not before the Court on the motion for partial summary judgment. (ECF No. 8 at 16).

sense.'" *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 135 Cal. Rptr. 2d 505, 513 (Cal. Ct. App. 2003) (quoting Cal. Civ. Code § 1644) (internal citations omitted). "When a dispute arises over the meaning of contract language, the first question to be decided is whether the language is reasonably susceptible to the interpretation urged by the party. If it is not, the case is over. . . . If the court decides the language is reasonably susceptible to the interpretation urged, the court moves to the second question: what did the parties intend the language to mean?" *Cedars-Sinai Med. Ctr. v. Shewry*, 41 Cal. Rptr. 3d 48, 60 (Cal. Ct. App. 2006) (quoting *Southern Cal. Edison Co. v. Superior Court,* 44 Cal. Rptr. 2d 227, 232 (Cal. Ct. App. 1995); *Oceanside 84, Ltd. v. Fidelity Federal Bank*, 66 Cal. Rptr. 2d 487, 492 (Cal. Ct. App. 1997)). "The interpretation of a contract is a question of law when the contract terms are unambiguous." *Abifadel v. Cigna Ins. Co.*, 9 Cal. Rptr. 2d 910, 919 (Cal. Ct. App. 1992).

**A. Failure to Adequately Staff**

The JV contends that there is no dispute of material fact that Helix was contractually obligated to supplement its work force and change the sequence of its work at the JV's request. The JV contends that Helix breached the subcontract by refusing to supplement its work force and change its sequence of work. The JV contends that pursuant to paragraphs 22(A) and 25 of the subcontract, it had the authority to determine whether Helix had provided enough worker and to request that Helix supplement its work force when the JV felt it was necessary. (ECF No. 25-1 at 15-18). Helix contends that the JV is permitted to request that Helix supplement the work force under the subcontract only if Helix failed to supply enough properly skilled workers. (ECF No. 28 at 7). Helix contends that there is a triable issue of fact as to whether Helix's work force was adequate and to whether the JV demanded that Helix supplement its work force as a means to accelerate the work schedule. *Id.* at 7-11.

Paragraph 25 of the subcontract provides that the subcontractor, Helix, is in breach of the contract "[i]f SUBCONTRACTOR refuses or fails to provide enough

properly skilled workers or proper materials, or maintain the work schedule." (ECF No. 29-1 at ¶ 8). This paragraph also provides the JV with remedies of supplying additional workers as it feels necessary for the completion of the project or contracting with additional contractors to perform Helix's work if Helix fails "to commence and continue satisfactory correction of the default" within forty-eight hours of receiving a a notice to cure from the JV. *Id.* Paragraph 22(A) of the project provides that, "Time is of the essence in this Subcontract . . . The Work shall be carried on promptly, with dispatch, coordinated with other work on the Project, all to the satisfaction of CONTRACTOR and OWNER. If necessary, upon instruction from CONTRACTOR, certain parts of the Work shall be prosecuted by preference to others." (ECF No. 29-1 at ¶7). The Court concludes that the unambiguous terms of the subcontract provide that Helix must supply enough properly skilled workers and that Helix is in breach of the subcontract if it refuses to supply enough properly skilled workers. No provision of the subcontract provides the JV with the sole discretion to determine if the work force supplied by Helix is sufficient.

It is undisputed that Helix refused to supplement its work force following the notice to cure from the JV. (ECF No. 29-1 at ¶ 34). However, Helix provides evidence that it supplied enough properly skilled workers. In the October 7, 2014 letter to the JV from Derek Hancock (Exhibit 4, ECF No. 28-4 at 16), the deposition of Brian Jordan (Exhibit 12, ECF No. 28-4 at 42-43), and the January 19, 2015 letter to the JV from Brian Jordan (Exhibit 9, ECF No. 28-4 at 26), Helix continually represented that it refused to supply additional workers because its current manpower was sufficient to support the available work. The Court concludes that material issues of disputed fact exist as to whether Helix was in breach of the subcontract for refusing to supply enough properly skilled workers to maintain the work schedule. The JV's motion for partial summary judgment as to liability on its counterclaim for breach of the subcontract arising from any failure to adequately staff the project is denied.

///

**B. Abandonment of Project**

The JV contends that there is no disputed issue of material fact that Helix materially breached the subcontract when it abandoned and failed to complete its work on the subcontract. (ECF No. 25-1 at 18-21). Helix contends that leaving the project did not cause the JV to incur damages. Helix contends there are disputed issues of fact as to whether the unpaid sum remaining on the subcontract was sufficient to cover the work remaining on the project. Helix contends that there are disputed facts as to the JV's mismanagement of the project and failure to timely pay Helix. (ECF No. 28 at 11-13).

It is undisputed that the JV "entered into a written subcontract with Helix to complete all of the low voltage communications, fire alarm systems, exterior lighting, and related electrical work for the BEQ, as well as the 'offsite' medium voltage replacement work." (ECF No. 29-1 at ¶ 3). It is undisputed that Helix informed the JV that it was leaving the project in January of 2015, prior to completion of the project. *Id.* at ¶ 43. Paragraph 13(B)(i) of the subcontract provides for a duty to proceed: "SUBCONTRACTOR shall proceed diligently with performance of the Work pending final resolution of any request for relief, claim, appeal or action arising out of disputes relating to CONTRACTOR." *Id.* at ¶ 5. The relevant language of the subcontract provides that Helix had a duty to complete its work on the subcontract and, in the case of any dispute, Helix was required to continue working on the project until final resolution of any request for relief, claim, appeal, or action. The Court concludes that under the undisputed facts of the case and the terms of the subcontract, Helix has not satisfied its burden to raise a disputed issue of material fact as to liability arising from its abandonment of the project.

Helix contends that leaving the project did not cause the JV to incur damages because the JV could have completed the project for the amount remaining on the subcontract at the time Helix left. Helix contends there are disputed issues of fact as to damages. The Court cannot address issues as to damages on the record before it

because the JV has moved for partial summary judgment on the issue of liability and has not moved for summary judgment on the issue of damages.

The Court grants the JV's motion for partial summary judgment as to liability on its counterclaim for breach of subcontract arising out of Helix's abandonment of the project.

**C. Defective Work**

The JV contends that there is no dispute of material fact that Helix breached the subcontract by performing defective work on the project and failing to repair, replace, or pay for the same work. (ECF No. 25-1 at 21-23). Helix admits liability for reasonable costs of repair for the load break elbows due to improper crimping and the end line splices. However, Helix contends that the counterclaim for breach of contract includes other allegations and seeks damages not addressed in the motion. Helix contends that the JV's request for a liability finding on all allegations made in the counterclaim is overbroad and a motion for summary judgment is the improper vehicle to address limited liability issues. (ECF No. 28 at 13).

Paragraph 14 of the subcontract provides, "GUARANTEE SUBCONTRACTOR guarantees and warrants its work against all deficiencies and defects in materials and/or workmanship. SUBCONTRACTOR agrees to replace or repair, at CONTRACTOR's discretion, at SUBCONTRACTOR's sole cost and expense, and to the satisfaction of OWNER and CONTRACTOR, any and all materials or work adjudged by OWNER or CONTRACTOR to be defective or improperly installed." (ECF No. 29-1 at ¶ 6). Helix admits liability for the defective end line splices and defective crimping conditions and it is undisputed that pursuant to the subcontract, Helix guarantees and warrants it work against all deficiencies. (ECF No. 29-1 at ¶¶ 6, 52-55). The Court concludes there is no disputed issue of material fact that Helix is liable for the defective end line splices and the defective crimping conditions. To the extent that the JV contends that Helix is liable as a matter of law for any defective work beyond the scope of the end line splices and crimping conditions, the

Court concludes that the JV has not met its burden on this motion for partial summary judgment.

**V. Helix's Complaint**

During oral argument, the Helix moved to dismiss Helix's complaint against the JV, Federal Insurance and Western Surety with prejudice.[4] The Court orally granted the motion and dismissed the complaint against the JV, Federal Insurance, and Western Surety with prejudice. (ECF No. 1). The motion for summary judgment filed by the JV, Federal Insurance, and Western Surety as to Helix's complaint is denied as moot. (ECF No. 25).

**VI. Conclusion**

IT IS HEREBY ORDERED that the JV's motion for partial summary judgment (ECF No. 25) as to liability on its counterclaims against Helix is GRANTED as to liability on the breach of subcontract arising from Helix's abandonment of the project and defective work on the end line splices and crimping conditions and otherwise DENIED.

IT IS FURTHER ORDERED that Helix's complaint against the JV, Federal Insurance, and Western Surety is dismissed with prejudice. (ECF No. 1). The motion for summary judgment filed by the JV, Federal Insurance, and Western Surety (ECF No. 25) as to the causes of action alleged in Helix's complaint is DENIED as moot.

DATED: April 10, 2017

*William Q. Hayes*
**WILLIAM Q. HAYES**
United States District Judge

---

[4] Helix contends that, "[G]iven the current status of the case, Helix no longer needs its claims for affirmative relief because its rights are protected under its Tenth Affirmative Defense of 'Set-off.'" (ECF No. 28 at 14).